Last case on our call this morning is agenda number four case number one oh four eight five four and one oh four eight seven one consolidated in Ray A.W. a minor versus you Eugene W. A.W. Mr. Mila is that right Milo okay Mr. Milo you may proceed Mr. Chief Justice may it please the court counselor I'm coming before you from a case that arises out of a juvenile neglect and abuse case out of Peoria County. This there are numerous issues before the court today the three that I've specifically asked the court to consider is whether or not the trial court correctly determine that my client was unfit as a parent whether or not I'm not sure Mr. Milo you just identified yourself for your oh I'm I'm sorry. I'm a attorney Louis Milo I represent the father Mr. Eugene Wells in the in the case thank you I apologize again the issues that I've I'm asking the court to consider today is whether the appellate court below. Erred in affirming the court's finding that my client is unfit whether or not an error in affirming that the trial court below was correct in finding that this minor was in an injurious neglected by reason of an injurious environment and in addition whether or not collateral estoppel was properly applied in this case the state has bought the issue before the court with respect to the fifth amendment self-incrimination matters. The court this matter with respect to my client this trial commenced with a wardship petition filed by the state alleging that my client had been that this child was neglected but because my client had been previously found unfit there been no subsequent finding of fitness and also that my client had been. There have been indicated reports that my client had been indicated for sexual molestation and exploitation in 1998 and 2002 and that he had not completed sex offender counseling. In fact, except at the time of the dispositional hearing, except for the single task of not having completed the sex offender counseling, my client had completed virtually all the tasks that he had been ordered to do. Those range from domestic violence classes, drug drops, sex offender assessment, he had been doing ongoing counseling, psychological evaluation, numerous of the sort of standard type of tasks that are required of parents oftentimes in juvenile cases. Correct me if I'm wrong, but I thought that according to both of the guardian and the state that there was evidence apart from the failure to complete the sex offender counseling to uphold the finding in this case. For example, Eugene failed to regularly attend individual parenting counsel sessions which were designed to help him raise the child. Were there things in addition to just the public guardian and both the state brought forth? There were other issues that were seized upon as a basis for this. Let me address the counseling specifically. As I recall the evidence, my client had attended all but one or two of the counseling sessions that the counselor was also present at. In other words, he had missed some counseling, but my understanding was that the counselor was not present for some of them. So when they looked at the record of counseling, about as many counseling sessions had been missed by the counselor as by my client at that point. But he had actually only missed one or two, as I recall, of the counseling sessions. Was that the only thing the public guardian and the state pointed to was the times that he missed counseling? Well, I think that was one of the major tasks that they had been focusing on. Not the only? Well, the sex offender therapy, that he had not completed that. And they had pointed to that as an important task for the basis for the finding. However, there were numerous other tasks, the domestic violence and all these other tasks. In addition, the dispositional report at the time did not disclose any subsequent offense by my client since the indications of 2002 for a sex offense. And no criminal charge or arrest with respect to a sex offense since 2002. And so looking at it in its entirety, there are other issues to look at. The evidence that was also presented to the court was that all the visits that my client had, both with the previous child, because he was a parent in a wardship proceeding that preceded this one, had gone well and his visits were going well. And his interaction was appropriate. Moreover, at no time did the state call any witnesses that could have testified specifically, directly, with respect to the indicated reports that happened in the previous case. The problem with the trial court's finding that my client was unfit is that the rationale adopted, which I think was adopted by the Third Appellate District, is that once a parent is found to be a sex offender, he's always going to be so found. I don't believe that in determining my client's fitness in this case that that was proper. His status, whether he agrees or not, the finding of him being a sex offender in the earlier wardship proceeding, standing alone, I would submit, does not establish a per se injurious environment, doesn't make him per se an unfit parent. And there are cases, baby boy butt, honorary TB, honorary LM, that suggest that past serious behaviors do not make a person unfit for life. Do any of those cases have the prior act sex offenses? Pardon me? None of the cases you just referred to, are any of the acts sex offenses? I think in honorary LM, in that case the father had been previously convicted of aggravated criminal sexual abuse, and I think in that case there was a sexual component. This was two separate acts as to this, two UG, isn't that right? Two separate indicated acts of sex offenses? Correct. There was a 1998 indication and a 2002 indication. The court below, I believe, presupposed that the only way that my client could achieve fitness was by completing really the last court-ordered task of sex offender, which I think in looking at the opinion that seemed to be a paramount consideration. I believe that the court below disregarded my client's really nearly four years without any evidence of actual sexual molestation or exploitation at the time of the dispositional hearing. And I believe that the passage of time with no new charges, and I would point out that he had never been convicted of any sex offense with respect to those two indicated reports. But I would point out that the passage of time with no new charges or illegal sexual behavior on the part of my client is probative and should have been considered by the court in determining whether or not he was fit or unfit. How many years of those four years were the children with him? Well, the child in this case was newly born, so it wouldn't have been with him for very long, but the previous child was continuing to be in protective custody of the state during that duration of that time. Now, the court had before it, though, that those earlier findings, they had the years of the findings, isn't that correct? Well, I believe they did. I don't think that the court, I couldn't tell from the court's decision whether it relied on that or it considered that at all, and I think it should have, and it should have been more explicit about that. But the court would have known that it was in the past and would have known that this is three years later or four years later or whatever it is? Well, that question sort of drives me into the collateral estoppel issue that came up in the court, which leads me to believe that the judge did not consider that, at least give very much weight to it, because when we attempt... He didn't consider what? The years, the passage of time. What I mean by that is that we had attempted to introduce new evidence, earlier evidence and then some additional evidence with respect to my client's status as a sex offender coming out of the previous wardship proceeding. He barred, made an evidentiary ruling barring us from presenting evidence on that issue, arguing that that matter was settled, and I believe that based on that ruling, I believe that he was relying on the previous decision finding of my client as a sex offender as a basis for finding him unfit in the present case. So I don't... I can't read the judge's mind, but I don't believe that he went much beyond what had been previously determined. But in any event, I do believe that the passage of time would have been probative. Really it's... And therefore that the previous finding of his unfitness, the previous finding that he was a sex offender, is really stale and somewhat with respect to the current case. I believe the court, again, ignored all of these service tasks that my client had completed at the time. And granted there was a counseling, but that's always going to be ongoing. And it was a sex offender therapy, but he was attempting to participate in both of those. And I don't believe there was any finding that he wasn't trying to make efforts in that regard. Did the GAO's brief say that he was uncooperative? In what respect? That the defendant was uncooperative in his treatment plan? The GAO may have stated that, but I don't believe that, in fact, he was uncooperative. That the therapist reported? The sex offender therapist? Reported that he was uncooperative. Yes, uncooperative in the sense that he was not prepared to admit that he committed a criminal offense. And that really was about the extent of that therapy with respect to that. Is it part of the record anywhere whether there was any privilege between the respondent and the therapist? I don't think there's anything in the record that speaks to that, but the Juvenile Court Act clearly, there's at least my reading of the court act, when you look at what can come into evidence, I think only the attorney-client privilege applies in juvenile court cases. So whatever happened would not be privileged with respect to the juvenile court proceeding. Even though that may not be privileged concerns, was someone like the defendant warned that his statement may be used? I don't know that the therapist gave him any kind of, for lack of better term, a Miranda-type warning. I don't know that anybody ever gave him that warning. Certainly, I am not aware that the therapist gave him that warning. I would be surprised if that were given. There's nothing in the evidence to suggest that that occurred, either from the court or from the therapist. Was it improper for the court to require sex offender counseling? Well, I think in this case, and we obviously appealed the earlier case, so from our point of view, no. What had happened was two indicated reports had been presented, you know, implying or stating that my client had offended. And that constituted really most of the evidence that I recall to establish that my client had offended. We had argued previously, and we're arguing as much today, that indicated reports are based on finding credible evidence. And there's no requirement that a contrary evidence be presented to make the indication. And our position was, you know, we've got a different standard, even in the warship neglect and abuse proceeding, which is the preponderance of the evidence, which is even a higher standard of evidence than a credible evidence standard. So our position is that he was not a sex offender, not proven by preponderance of the evidence that he was a sex offender. We had intended to put evidence on to demonstrate that, which would have included all the things we've discussed already in terms of the services and having no instance of recidivism for nearly four years. But so our position is that, no, he should not have been required to do that. He wasn't ordered to do sex offender treatment. I mean, he was ordered to do a sex offender assessment, which in the file of recommendations and the recommendations. Would you say that again? He was ordered to do a sex offender assessment. Sex offender assessment. And then what did you say? And out of the assessment came the recommendation. But that was a foregone conclusion because he was already in sex offender therapy, and we knew what the recommendations would be. But in any event. Well, tell me about that. How was he in sex offender therapy? Well, from the previous case. Oh, you're talking. Yeah. Okay. He was in sex offender therapy from the earlier case, and then in this case they ordered an assessment. I believe they may have just completed the therapy. I can't recall off the top of my head. All I know is that he was to continue doing his sex offender therapy. What specific order did the trial court make in this case on that issue? Well, that would be the dispositional order. My recollection is that he was to complete sex offender therapy in the second case. First case he was asked to do a sex offender assessment and follow the recommendations which recommended therapy, and then that carried over into the second case. My recollection is that in the second case he was ordered to complete that therapy. Did the trial court require him to admit prior acts? Oh, I believe it did. I think it put it in effect. First of all, yes, I think it did, and this is why. Because there was evidence before the court at the dispositional hearing in this case. In this case. In the latter, that my client had attempted to go to the therapist and had denied that he had committed an offense and the therapist had discharged him. So that evidence was before this court in this case, that he had gone to therapy, he had refused to admit to commission of a crime, and he was discharged. He attempted alternative ways to do it, but it was not successful and he was discharged. So the court knew, the trial judge knew in this case, that if he was going to go to the same therapist, which in all likelihood he was going to, that he was going to be discharged if he continued to deny that he committed a crime. So I believe directly the court knew that was happening, but ordered the therapy anyhow. But even if the court didn't know that, I would submit that the court put into motion a chain of events that would have required at some point that my client make an admission in order to be successful and make the progress that is required by the Juvenile Court Act. And that alone would have been sufficient, I think, to be in violation of this Fifth Amendment right, which is the additional issue that has been raised. Well, how do you address the state's argument that there's no dispute, is there, that this was a private therapist, not a governmental agent? Well, the therapist, I believe, was with an agency that contracts with the Department of Children and Family Services. And so I guess they're private in that sense, but there is, I believe, a monetary connection there. Well, how do you address the, again, it was a private therapist. I think. With some connection to DCFS. Right, right. How do you address their argument that the Fifth Amendment wouldn't apply to an admission to someone in private industry versus a governmental agent? Well, I think it's the effect, not who you're admitting it to. I think that certainly we would all agree that a court could not, well, we may not all agree, but I would submit that the law is pretty clear that if a court specifically ordered somebody to go to the sheriff's office and turn themselves in and admit to committing a murder, that would be violative of the Fifth Amendment. The fact that the court says, well, you don't have to go to the sheriff, why don't you go down the street to the hot dog vendor and you tell them that, it's still an admission, a party admission. It's still going to get into evidence. What about the reverse, Mr. Melo? Does that mean that a court would be, well, certainly, under your theory, would be precluded from sending someone to a therapist who is going to say, the only way I can help you is if you admit the problem, admit what you did. So I guess the court in general now would have to find therapists that would not require that to go into their counseling. Right. Well. Or have them complete their counseling. You know, the court and the state. It's a tough problem, isn't it? Well, the state is free to develop solutions to these problems within the context, you know, within the context of our Constitution. I would propose that there are several options. First of all, and I think coming out of the Mace v. Amstoy line of cases, a federal line of cases, the idea that the court could give judicial use immunity to the parent so that anything they said in counseling could not be used against them subsequently. The state, the court could direct the state, you know, if you think this guy committed a crime, charge him and try him. At least give him the benefit of a trial where the standard of evidence is what it ought to be. The court could also, yeah, do what you've suggested. Well, he's to go into therapy, but he's not going to be required to make an admission. You can do it through a hypothetical scenario. So there are different possibilities out there. The court does not foreclose. You know, the object of the Juvenile Court Act can be achieved, notwithstanding the Fifth Amendment. See, my time is up. I don't know. Thank you, Mr. Melo. Mr. Hosen. May it please the Court. I am Assistant Attorney General Richard Hosek, counsel for the people in this case, and I urge the Court to affirm all aspects of the appellate court's decision except its ruling on the Fifth Amendment issue. I urge the Court to affirm the finding that collateral estoppel applied in this case and that the evidence supported the circuit court's findings of neglect due to an injurious environment and the unfitness of the father in this case, even without regard to the weight given to his failure to complete sex offender therapy. As appellant, I'd like to direct my attention first to the Fifth Amendment issue, and then if I may respond. Just before you start that, do we really need to rule on the Fifth Amendment question if there was enough evidence to do so that would support the finding of the court? Do you absolutely need to do so? No. But as a practical matter, if you leave the Fifth Amendment's published, excuse me, the Third District's published Fifth Amendment decision on the books as precedent for all lower courts in Illinois, you would leave intact what we consider to be a fundamentally flawed statement of constitutional law that would affect juvenile proceedings throughout the state. It departs from the precedent of the same court in the LF decision less than a decade earlier. It departs from the precedent established by all other courts of other jurisdictions that have carefully looked at this. Would you list the other evidence that was adduced that would support the finding of the court? Yes, I believe there is, Your Honor. Would you tell me what they are? Certainly. It's the past history of abuse itself creates a very strong basis for the finding. That accompanied by the father's state of complete denial that he had done anything wrong or that he had a problem. The evidence in front of the court was that this person had not victimized or abused two minors in his care, young girls, a six-year-old niece and an eight- or nine-year-old granddaughter, but had abused the second one on repeated occasions. The medical evidence supporting the indicated reports was plenty sufficient for the appellate court to rule in the earlier decision that it was sufficient to find that abuse. And it's not true that there's a per se rule that if you have committed some abuse once, you're forever per se an abuser. But nor is there a categorical rule that evidence of abuse in one case is never sufficient to support a finding of unfitness in another case. And here we have a situation in which the circuit court had the evidence in front of it, including the fact that the father had committed repeated instances of abuse of two children in his care, was in a total state of denial about having a problem. He fought with a caseworker repeatedly about whether he really even should be required to complete sex offender therapy. The caseworker reports show that when the caseworker showed up, he had pornography on. He kissed the caseworker on the neck and asked why he was doing this. He said, well, she let me do it. I could do it, so I did. This is somebody who has a serious problem. And in this court's decision of A.H. where it approved the principle of anticipatory neglect, the principle based on common sense that you don't have to wait for every sibling to be abused before they get the benefit of the court's protection, this case cries out for the type of protection that the circuit court found was warranted here. As to the neglect finding, there is also the additional evidence related to the mother, because the focus is on the child, not the blameworthiness of the parents, although obviously the parent's conduct contributes to the environment that determines whether the children are neglected. And there has been no argument by the court. Was there an actual hearing, or did the court simply look at the record that demonstrated that there were these two indications in the record? There was an evidentiary hearing. There was a trial at which the father here testified, and the circuit court in that case found his testimony to be. . . That was as to these two indicated? Yes. He testified he denied that he'd done anything wrong, and the circuit court concluded that his testimony was not candid or believable. And the appellate court based its decision after that trial, after review of the evidence in that case. It found that there was sufficient evidence to support the finding of abuse. The children didn't testify in that hearing? No, the children did not testify. Was there evidence offered, hearsay evidence offered from the children? Well, in the indicated reports from DCFS, which I believe went in without objection, there was hearsay that was reported, and it may have been through, you know, even a second layer of hearsay, where the children reported to a teacher. Then that was confirmed by the children's report to the mother in one case. There was another child's report to a school teacher. The father, originally interviewed by the DCFS investigator, made some admissions that he later retracted in open court. So, yes, there was hearsay. I believe the hearsay went in without objection, and the Juvenile Court Act does permit a certain amount of lenity in these circumstances. I wasn't the person who tried the case. I wasn't in, you know, opposing counsel's mind when he made decisions about what to attack and what not to object to. But there was a trial. That trial resulted in a finding that this abuse had occurred in both instances. There was, again, the medical testimony. And the collateral estoppel attached not to a finding of unfitness in this case. The collateral estoppel attached to the incidents of abuse themselves. That was the issue as to which collateral estoppel properly applied, based upon satisfaction of the relevant elements of that standard. Nobody prevented the father in this case from putting on any evidence that, although he may have been found unfit earlier in the prior proceeding, subsequent events had occurred so that he should be found to have rehabilitated himself or to be fit in this case. He didn't put on any evidence. What he tried to do was relitigate the prior issue and offer his own testimony that he didn't do what the court had already found and the appellate court had affirmed he had done, which was to molest his niece and his granddaughter on prior occasions. There was no denial of any opportunity for him to present additional evidence to the separate, broader issue of unfitness. But nonetheless, the circuit court was on solid ground in concluding that the evidence before it, including the father's persistent denials that he had a problem or had done anything wrong, that he remained unfit in this case for purposes of its dispositional order. Counsel, returning to the Fifth Amendment issue, again, it's kind of troubling to think that if a court orders a permanency plan and within that permanency plan therapy is required, sex abuse therapy or any other therapy, if a respondent refuses to cooperate because he has to incriminate himself, could he notify DCFS to have another therapist appointed so he wouldn't have to incriminate himself? Because it seems like every respondent in this situation could refuse by saying that. Yes, it is potentially a problem, but the answer to it is not simply to contact DCFS. If this father had shown an active desire to pursue alternative therapy, as opposed to an attitude of let's run out the clock and if it didn't work one time, I'm off the hook, if he'd shown an active concern to fulfill the legitimate obligation to pursue sex offender therapy, his responsibility was to contact the court. The caseworker can't be his lawyer. The only person who can change the nature of the court's order here, which did not specifically require any incriminating admissions or any waiver of Fifth Amendment rights, if he was at an impasse because the private therapist that he had seen essentially said, we're not going anywhere because you won't admit that you did anything wrong, and he wants to pursue alternative therapy, if he believes that he's a meaningful candidate for that, because not everybody is, and if he fails because he's not a candidate for any good therapy, that's not a Fifth Amendment. But had he notified the court, could he have gotten another therapist? Yes, I think that's a legitimate middle ground, and some of the cases address that, and I've discussed those in my brief. I mean, there are the two broad categories here that are well recognized by the cases, what I call the do's and don'ts. The don'ts are you can't specifically order, waiver Fifth Amendment rights or self-incrimination or adopt a service plan that has those specific requirements, and nor can you take into account and penalize a parent for invoking their Fifth Amendment rights. That's the same. That's after the fact. But likewise, it is legitimate on the other hand for the court to be able to order sex offender therapy based upon prior adjudication of physical or sexual abuse. The father doesn't dispute that ability in this case. And at the end of the day, if the parent fails to complete that therapy successfully, it is normally permissible for the court to take that into account because that's attributable to the state's interest in not putting children into the hands of parents who have a prior history of abuse and haven't rectified the problem. There is a middle ground, and that's what I understand you'd be focusing on, Justice Burke, which is the situation where the court basically is on the permissible side of those two categories, but you have sort of a middle situation, which is the parent here goes to a therapist, and there's an impasse because the parent says, listen, I'm not going to admit that I did anything wrong. And our position is that in those circumstances, it is not the court's responsibility to identify and find alternatives for the problem. And that's what the appellate court's decision, the majority's opinion, did in this case. It shifted responsibility for completion of sex offender therapy from the father to the court, and that creates a backwards incentive. It creates an incentive for ñ it rewards parents who are in a total state of denial that they did anything wrong, which is counter to plenty of case law that says those are the parents for whom the problem is often the worst. And it creates an incentive for them to delay, to avoid, to evade, and to seek an excuse not to undergo therapy, where at the 12th hour, the last minute, they show up in court and say, oh, I was discharged because I told the therapist I never did anything wrong, wasn't going to admit it. And then the court's in the position of having a dispositional hearing scheduled, no request for a continuance, no objection to that schedule, no request by the father for the court to give the father an opportunity to pursue alternative therapy, no showing by the father that he is a candidate who's susceptible to benefiting from such therapy, and then essentially says, okay, end of story, we're done, you can't take that against me. That's shifting from the father who has the responsibility to complete such therapy. That shifts responsibility from the father to the court, and it does so in ways that create perverse incentives. If there is a situation, and I'm going to use this as sort of a rough analogy, if a court orders somebody specifically to undergo Alcoholics Anonymous program because they have a drinking-driving problem, and there are cases that say, well, that has sort of a religious component, and we're not going to approve court orders that specify that type of therapy. Well, if the court simply said, all right, well, I'm going to take out the specification of Alcoholics Anonymous, and I'm going to tell the offender here that they should do any alcohol rehabilitation therapy. If the offender then comes back to court and says, you know, we live on an island, there's only one Alcoholics program on this island, and the only one is Alcoholics Anonymous, the court says, okay, fine, you know, then we have a dilemma here, and we'll work to solve that dilemma. But there was no showing of that in this case. There was no effort to make such a showing. The father never said to the court, you know, through his attorney, I think I could benefit from therapy that would not require an admission, and I've reached an impasse. I'd like an opportunity to pursue that. And I think there is perhaps some clarification required of the record. The father says in his brief that he told the therapist that he wanted to pursue alternative strategies, and I don't believe the record supports that. The father said he told the therapist, let's talk about something else. Let's move on to something else. And his attorney asked him at the trial, at the dispositional hearing, did the therapist suggest alternative therapies? And the father said no. The father never said that he tried to pursue alternative therapies. The evidence also shows that the caseworker tried to get the father to go back and see what benefit he might get even without making an admission. And I understand that the way this counseling sometimes works is that you avoid the difficult admissions to begin to see if there's any receptivity or empathy by the parent for the problem of the victims. And sometimes that opens the door to progressing further towards meaningful therapy. And the caseworker in this case suggested that. But apart from those clarifications of the record, the key point is that it was incumbent upon the father, not the court, to ensure that sex offender therapy was successfully completed. And the father never asked for an opportunity to do so. And now he's trying to say, I'm off the hook. You can't take into account the fact that I failed when I never asked for an opportunity to do so. Is it realistic for a father who maintains actual innocence to come and say, I can benefit by therapy or counseling? I can't say that there's any rule of law or social science that says it's impossible for a father who won't admit doing anything wrong to benefit from therapy in which he doesn't have to make an incriminating admission. I'm not aware of any law to that effect. I believe the literature does indicate that there are some alternative therapies out there. There's no guarantee that they're always successful. There's no guarantee that sex offender therapy will be successful no matter how it's pursued. But there is therapy available, at least according to some of the literature I've seen referred to in the law reviews and other materials, where there is not a focus on admission. There's a focus on alternative ways to try and address the problem without making an incrimination. I would object to the notion that the state has to compromise enforcement of the criminal laws by granting immunity as the price for ensuring the protection of its children. We don't think that that is a rule of law that the court should adopt. But my point was, if a father maintains actual innocence and doesn't need therapy, is it realistic to expect that the father will come forward and say, I'll go through therapy because I think I need it, even though I've never, you know, the indications are wrong, everything is wrong? Well, I guess I misunderstood. I didn't realize your question assumed that the father doesn't need therapy. Because in this case, the evidence shows, I think, that there was a finding of prior sexual abuse. There was a sexual assessment done. The sex offender assessment indicated that he needed therapy. The father here doesn't dispute that he needed therapy. He just disputed the fact that in the therapy that he went to, the private therapist finally, after six sessions, said he's on cooperative. And the father said, that was because I denied ever doing anything wrong and that I needed any therapy. The father here was never charged criminally for anything previous. I believe he may have been charged in one case, and I forget whether it's the record shows this or not, but I believe that the relative minors were not willing to testify, and accordingly the cases did not proceed against him. Just touching upon the question raised earlier, I also think that it appears that a privilege would not apply to the patient-therapist relationship if there is an admission of even past sexual abuse. So it's unlike the crime-fraud exception for lawyers, which deals with ongoing or future instances. So we're not relying upon the protection that would have been provided by such a privilege in this case. The evidence in the prior case, I think, is amply indicated by the record, showed that the instance of sexual abuse had occurred. They were offensive. The father was in denial of them. He was in a situation where the circuit court was on solid ground in finding both neglect and abuse. The standard of review for that is manifest weight of the evidence to suggest that this record would not support that type of finding unless the court were to adopt a rule that new evidence of abuse has to exist every time the issue of unfitness comes before a juvenile court. That would be, I think, not something that could be overturned in this case. I have a few minutes remaining. If the court has any other questions on the cladible estoppel questions or the manifest weight of the evidence issues for neglect or fitness or the Fifth Amendment issues, I would urge the court to, in an issue that it has never previously addressed, to embrace the holding of the appellate court's earlier decision in LF, which says there's a very fine but important distinction between ordering somebody to undergo therapy and taking into account their failure to do so on the one hand and specifically ordering a person to make admissions or waive Fifth Amendment rights or penalizing them for failure to exercise those rights. There is this middle area where if there's a Hobson's choice, then it is our position that it is incumbent upon the parent, not the court, to seek relief from that or to prove futility. But that was not done in this case. And going further would create perverse incentives that we urge the court not to do. Thank you, Mr. Hosea. Thank you so much, Your Honors. Rebuttal, Mr. Melo. Thank you. I want to first respond to Justices Garmon's previous question. The dispositional order specifically required that my client successfully complete sex offender counseling. So it wasn't an assessment in the second, in this case. With respect to, and I would remind the court that my client, I was appointed counsel for my client at the trial level. In other words, he was determined to be indigent. He's not going to hire a therapist on his own. He's going to be dependent upon who the court and the DCFS finds for him. And to that extent, that is a limiting factor in his ability to find alternative therapy. So he does rely on the state and DCFS to some degree to find a therapist for him that could do the therapy that would not require an admission. And we've talked about that. Do we have any assurance that there is alternate therapy available anywhere in which the person being treated will not admit to the act itself? I believe, I don't have any personal knowledge of that. But I've heard that there may be some counseling available where hypotheticals are presented. And I think my information is pretty consistent with what the state has offered. But nobody requested of a court that there be a search for that in this case? No, I don't think anybody requested it because it was before the court. It was obvious, we believe it was obvious to the trial court in this case, that he was not going to get the therapy that he needed because he had been discharged for refusing. However, it's presented, it's clear that he was denied, the record is clear that he was denied further therapy. It seems that the prosecution would put something of a burden on the respondent and his attorney here to try to do something to initiate another type of therapy. Well, I think in this case, we're coming off of the dispositional hearing where my client took the stand and basically told the judge, this is what's going on. Whether he should have gone beyond that and said, well, I'm not getting therapy because they're discharging me, because I'm not admitting I committed this offense, would you order me to go to alternative therapy? That would have been nice, but I don't see that it would have been necessary in this case, because I think it was apparent that that had reached an impasse. But counsel, wouldn't in a normal situation, a parent who wants to keep their child or keep their parental rights, that they would try to do as much as possible and cooperate? Not necessarily incriminate themselves, however, but seek out, perhaps through the caseworker to the court or through the attorney to the court, alternative counseling. Well, first of all, my client, I believe, was cooperative, as I've indicated. He did a lot of the other services that he'd been asked to do. This was the one service that he was having trouble with because the therapist had an obstacle, perhaps a professional obstacle, in terms of getting him to make a denial. I wouldn't suggest that my client is particularly, you know, I don't think he's college educated. I don't think he would know what alternatives are out there. Certainly the caseworkers, DCFS, would have better information than my client. And after all, it is the state that imposed the task on my client. It made that determination that he ought to do that. So I think the state does bear some responsibility to make sure that he can get into a therapy that's going to be satisfactory to the state. It's not imposing that burden on my client. To try to find a way to do the therapy, I think, is asking a lot of a parent in these kinds of situations, particularly if they have other services that they're being asked to do and they don't have access to necessarily the information that we might expect them to have. But, you know, and he doesn't have the money. He's an indigent. He wasn't paying for therapy, was he? Pardon me? He wasn't paying for any of this. No, not for this. The state was paying for everything. Exactly. Yeah, that's my understanding. So I don't know that he had a lot of options. He was pretty much, in his mind, he got this attorney. He may not have wanted me. He may have preferred a different attorney. He got a therapist. And I think his experience in the case was, I'm getting what I'm getting. I don't really have a lot of options. But I wanted to address the, you know, there's a mention of Alcoholics Anonymous. This is a situation where my client, if he were an alcoholic, if we're going to draw analogies, was sober for almost four years. And now we're saying, well, you've got to go and you've got to do an institutionalized type of treatment program. But it seems to me that... He might have said, I'm not an alcoholic, I don't need your treatment. I mean, yeah, to have him come and say that, the fact that he's demonstrated sobriety in the way a sex offender allegedly would, alleged sex offender would demonstrate sobriety by not re-offending for nearly four years. I think we can't, and that's why I stress that, because this is a situation where, you know, that is the case. If we're going to draw those analogies, why would we put somebody in treatment if they've been sober for four years? The... I believe that, you know, there is a state's interest in protecting these children. It's compelling, but it doesn't trump the Fifth Amendment. Right. And I do believe that there are alternatives, and I think the immunity alter is one alternative. Even if we find a violation of the Fifth Amendment, can't we still look at the remaining evidence in the case to determine if the decision below is supportable? Decision below with respect to... Any appellate court other than the Fifth Amendment issue? Support of the finding of unfitness or the injurious... Yes. Well, certainly, this court would have to look at the record and see what evidence is below. I'm suggesting to this court that that evidence, that state did not meet its burden of proof, and it is the state's burden of proof in each case to demonstrate, one, that the parent is unfit, to demonstrate that there is, in fact, an injurious environment, not for another child, but for this child. And there's a mention... Well, clearly, you can find an injurious environment based upon what the parent has done to another child. It doesn't have to be the child whose case is forced, particularly an infant. Well, I think... And that's where we have... When we're talking, I think we're sort of tiptoeing around the anticipatory neglect argument, and strictly speaking, the anticipatory neglect applies, strictly speaking, to an offense against another sibling or neglect against another sibling. And while we do have an earlier case where there was neglect found by reason of an injurious environment, there was never any evidence that my client ever perpetrated against any of his sons, either his previous son or this son. And I think the Florida... There are Florida cases that I think R.A.B.C. is one of them. They do talk about, you know, just because you've offended against one type of victim doesn't mean you're going to offend against all of them. And there's no evidence that my client was homosexual or was the type that would offend against his boys. So when we're talking about that anticipatory neglect, it really doesn't strictly apply to this case. I believe that the court had to make its decision based on the merits of this case, what was before it in this case, because I don't believe the previous case was helpful to determining whether the environment would have been injurious for this child. And that's why I wanted the court to allow us to revisit the issue of the sex offender and be a little more detailed in terms of what it was that he was alleged to have done. And the evidence at the earlier trial was hearsay evidence. The girls didn't take the stand. There was no medical expert who took the stand. And yes, in some cases it was double hearsay, but it all gets in under the liberal juvenile court act. Just about everything seems to get in if it's certified. So we would ask that the court give some clarity in terms of what it takes to find a parent fit, what is the burden on my client to be found fit or whether it's the burden on the state to find him unfit in this case, in each case. We believe that it's the state's burden. We believe it's the state's burden to find that it was an injurious environment. We don't believe it did that. So we would be asking court to reverse the appellate court decision and, of course, the trial court with respect to the finding of unfitness and the finding that this child was in an injurious environment. I don't have a problem with this court affirming the appellate court's decision with respect to the Fifth Amendment issue. I think it was an attempt to craft a remedy to try to resolve the problem, but I think that you can go beyond that with giving immunity to the parent. Thank you. Thank you, Mr. Melo, and thank you, Mr. Hussag. Case number 104854 and 104871, Consolidated In Re A W, a minor, versus Eugene W. et al., is taken under advisement as agenda number four.